Raymond P. Niro
Vasilios D. Dossas
NIRO, SCAVONE, HALLER & NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois 60602
(312) 236-0733

Gregory D. Phillips (4645)
Kevin A. Howard (4343)
HOWARD, PHILLIPS & ANDERSEN
560 East 200 South, Suite 300
Salt Lake City, Utah 84102
(801) 366-7471

Attorneys for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PHILLIP M. ADAMS & ASSOCIATES, L.L.C., a Utah Limited Liability Company, <br><br> Plaintiff, <br><br> vs. <br><br> DELL INC., FUJITSU LIMITED, FUJITSU COMPUTER SYSTEMS CORP., MPC COMPUTERS, LLC, and SONY ELECTRONICS INC., <br><br> Defendants. | **ADAMS' MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS AGAINST SONY INCLUDING TERMINATING SANCTIONS BASED UPON SONY'S SPOLIATION OF EVIDENCE OF SONY'S PIRACY** <br><br> Civil No. 1:05-CV-64 <br><br> The Honorable Ted Stewart <br> Magistrate Judge David Nuffer |

I.   **INTRODUCTION**

A disturbing trend has emerged in this case, just as it did in the Gateway litigation.  Like Gateway, Sony has lost or destroyed the most critical evidence in this case.  This destroyed and lost evidence would have demonstrated Sony's piracy of

Adams' patented technology.   Because of Sony's spoliation of evidence, Adams respectfully requests that this Court enter terminating sanctions against Sony on liability issues, and that this Court hear Adams' claims for the amount of damages.

Sony was warned that such spoliation could result in terminating sanctions. Sony sought to intervene in the Gateway litigation [Adams v. Gateway Dkt No. 568] and obtained copies of all of this Court's Orders (sealed and unsealed) regarding Gateway's spoliation of evidence and other misconduct [Dkt Nos. 581 and 582].   Thus, Sony was "warned" by this Court that the spoliation of evidence could result in terminating sanctions.  E.g., Dkt No. 484, Memorandum Decision and Order at 17-18 (including the "warn[ing] that if there is further evidence that is missing or tardily disclosed, or if it engages in further conduct that impedes the disclosure or discovery of relevant evidence further severe sanctions, including entry of judgment, shall be imposed.") Despite this clarion warning, Sony has engaged in conduct that is just as egregious as Gateway's misconduct.

## II.    THE FACTS REGARDING SPOLIATION

### A.    Nature of the Lawsuit

This lawsuit involves Sony's unlawful and wrongful piracy and infringement of Adams' patented computer technology that repairs data corruption defects in Floppy Disk Controllers used in computers.  As discussed below, in 2000 and 2001, Sony engaged in licensing discussions with Adams.  Rather than license Adams' patented technology and pay Adams royalties and compensation as responsible companies such as Hewlett-Packard and Compaq did, Sony consciously and deliberately decided to pirate and infringe that patented technology – just as Gateway did.

Dr. Phillip M. Adams has a Ph.D. in applied computer science and a D.Sc. in engineering.  He has over 30 years of practical experience in the computer industry; he has served on the faculty of major universities throughout the world, and has consulted with numerous governments on technical issues; and he holds numerous patents in the field of computer science. He is one of a very small number of people worldwide that truly understands the subject matter of his patented technology.

During the late 1980's, Dr. Adams discovered that floppy disk controllers ("FDCs") of various computers were defective.  The defective FDCs caused the random destruction or corruption of data without any way for the user to determine that data had been destroyed or corrupted.   The random destruction or corruption of data in computers is a most serious problem, and is potentially cataclysmic.

Computers are used throughout society, and the data integrity of computers is the lifeblood of the information age.  Society relies upon the integrity of data stored by computers and exchanged between computers to support virtually all aspects of society including: financial transactions; accurate and effective medical diagnoses and treatment; the proper design and construction of automobiles, aircraft, bridges, dams, office buildings and other devices and structures vital to public safety.

Society also depends on the integrity of data used by government computers. For example, if data in the Department of Defense computers, pinpointing enemy targets is corrupt, the weapons aimed at those targets badly miss their mark and possibly kill innocent civilians.  If data in our civil air system computers is corrupt, the system will fail.  Indeed, Dr. Adams understands that the shut down in the air traffic

system that occurred in the Western United States in October 2000 was most likely the result of a data corruption defect in FAA computers.

In the years since Dr. Adams discovered the defective computers, he has devoted thousands of hours to developing solutions, alerting the Federal Government, State Governments, computer companies, and private purchasers, and assisting computer manufacturers to acknowledge the defects and repair their computers. Dr. Adams has developed several patented computer technologies that will detect which computers are defective. He has also developed patented solutions that fully resolve the defective computers so that data does not become corrupt or lost. These technologies are the subjects of the patents-in-suit.

## B.   Sony's Spoliation of Evidence

As it was in the Gateway litigation, a watershed event for the technology of the patents-in-suit, if not for the entire computer industry, was the discovery of data corruption problems in many computers that led to the $ 2.1 billion that Toshiba paid to settle a class action lawsuit in November 1999.

The fallout from the $2.1 billion Toshiba settlement was immediate and notable. Hewlett-Packard sought Dr. Adams and requested a license for patents that detected and corrected the data corruption problems – the patents-in-suit. Compaq Computer did the same. They paid substantial sums of money to license Adams' patented technology. Others, such as Gateway and Sony chose to infringe the Adams patents rather than license them.

On April 12, 2000, another class of plaintiffs sued Sony Corporation in the United States District Court for the District of Minnesota, alleging that Sony sold computers with

defective floppy disc controllers (FDCs).   That case was titled <u>Christian v. Sony</u> <u>Corporation</u>, Civ. No. 00932-DFW-AJB ("the Christian class action"); and Sony retained the law firms of Heller Ehrman and Dorsey & Whitney to defend it.  The Christian class action was very similar to the class action brought against Toshiba and others in Texas.

During the pendency of the <u>Christian</u> class action, approximately six months after its filing, Sony representatives met with Dr. Adams and Gregory Phillips (counsel for Adams) at the offices of Heller Ehrman in San Francisco.  The date of that meeting was on or about November 7, 2000.  Dr. Adams and his counsel went (1) to demonstrate that Sony's computers were defective and that Sony needed to repair them; (2) to demonstrate Adams' patented detection and solution technology which Sony could incorporate into its computers; and (3) to discuss a possible license of the Adams patented technology for Sony.  Dr. Adams did indeed make those demonstrations and offered a license under his patents, but Sony did not accept it.  (See the attached Declaration of Dr. Phillip M. Adams.)

Two months later, on January 9, 2001, the parties met again at Heller Ehrman's offices in San Francisco.   Dr. Adams again sought to demonstrate that Sony's computers were defective.  However, this time he found that some of Sony's computers no longer had some of the defects.  Adams believes that Sony, just like Gateway, had replaced the defective Winbond Super I/O chip with a Winbond Super I/O chip that incorporated the Adams technology, *i.e.*, an infringing Winbond chip.  Thus, one can only conclude that Sony must have communicated with Winbond after the first meeting, just as Gateway had communicated with Winbond after Gateway met with Adams.

The Sony representatives in attendance at the meetings included the following:

| Sony Employees | Sony In-House Counsel | Sony's Outside Experts | Sony Outside Counsel |
|---|---|---|---|
| Eric Jenkins | Chris Ekren | Gary Stevens On Track International | Michael Williams Heller Ehrman |
| Fred Tauber | Ed Sheehan | William Philmill Zunddesign Inc. | Bob Schwarzbauer Dorsey & Witney |
| Norio Kitamura | | | |
| Tabashi Yoshida | | | |

Thus, Sony had four business and technical employees, two in-house counsel, two outside experts, and two outside counsel – a total of ten representatives at this meeting. These meetings and all the people attending them undoubtedly generated a large volume of documents, notes, and correspondence within Sony.  In fact, Dr. Adams and his counsel observed the participants taking copious notes during the meeting.   In addition, Sony undoubtedly corresponded with Sony's suppliers regarding the defective computers that Dr. Adams demonstrated at the meetings.

Sony's privilege log in this lawsuit, which Sony served on Adams on December 15, 2006, includes only eighteen (18) entries, arranged in chronological order, starting with a document dated November 8, 1999 and ending with a document dated January 5, 2000.  (Copy of privilege log attached as **Exhibit A**)  All of these entries relate to the Toshiba class action settlement; and Sony has withheld them based on attorney-client privilege and on the work product doctrine.  (Thus, Sony expected litigation involving their computers and their defects as early as November of 1999.)   Sony has not disclosed nor claimed privilege with respect to any of the notes taken in the two meetings, or any other documents.  And, Sony has astonishingly stated that Sony has not communicated with its suppliers about Sony's defective computers or Adams at all.

At the second meeting, in January of 2001, Sony representatives asked Dr. Adams for a test jig with which they could test the Sony computers.  Ordinarily, a jig is some sort of mechanism used to test equipment.  In this case, it was a routine or series of steps written out on a sheet of paper.  By the end of January, 2001, Adams complied with Sony's request and provided Sony with the first of the jigs that he provided.

However, the first test jig that Adams provided was a Linux Test Jig which apparently did not serve all of Sony's purposes. (Copy of the Linux test jig attached as **Exhibit B**)  Sony then notified Adams that it needed a Windows jig for its computers.  By the end of March 2001, Adams provided the second of the jigs to Sony, the Windows NT test jig (attached as **Exhibit C**).  The participants in the two meetings and the recipients and evaluators of the two test jigs undoubtedly produced a flurry of testing, documentation and correspondence within Sony.

On July 6, 2001, the District Court for the District of Minnesota dismissed the class action against Sony for jurisdictional reasons, finding that the federal statute under which the class sued did not allow for claims against Sony.  With this development, Sony apparently got all that it wanted: a dismissal of the class action against it, an explanation from Dr. Adams of the defects in their computers, and a working knowledge of Adams' patented technology to solve those defects.  The line then went dead.  Sony ceased communication with Adams.

After some time, on August 18, 2003, Adams' counsel wrote to Sony's general counsel, Ms. Nicole Seligman, to again try to re-establish communications.  (Letter attached as **Exhibit D**)  The very next day, Sony's outside counsel who had participated in the previous meetings, wrote back, complaining that Adams had not provided Sony

7

with "a copy of the source code for his diagnostic program or explain[ed] how his software patch fixed the alleged problem."   (Letter attached as **Exhibit E**)   This exchange memorializes the meetings between the parties, and, at the very least, establishes that Sony was continuing its activities and investigations with respect to the defects in their computers and generating volumes of documents.

Adams, at that point, had filed suit against Gateway.  And, towards the end of the Gateway litigation, Adams discovered evidence that formed the basis for its claims against Sony.   Adams sued Sony and others on May 12, 2005.   After all of the defendants answered the complaint in this litigation, Adams served written document requests, asking Sony to produce, among other documents, documents relating to Adams, the patents-in-suit, and correspondence between Sony and its suppliers relating to Adams or his patents. (Adams first set of requests for the production of documents attached as **Exhibit F**).

Adams followed the formal written document requests with repeated requests for Sony to produce documents relating to Adams, the patents-in-suit, and the Toshiba settlement, documents such as communications with suppliers (*e.g.*, Winbond) and with outside computer experts -- documents which Adams had reason to believe existed. Sony did not produce any such documents.

Adams then brought its second motion to compel, seeking this Court's assistance in forcing Sony (and the other defendants) to produce documents relating to the Toshiba settlement, and those relating to Adams and the patents-in-suit.   Sony opposed, first arguing that Adams' requests did not cover the subject documents, and then arguing that, in any event, Sony had produced the subject documents to the extent

that they existed.  (But, it had not produced any such documents.  Sony did not produce documents relating to the two meetings, the test jigs, or communications with its suppliers and technical design experts.)

In its February 22, 2007 Memorandum and Decision (attached as **Exhibit G**), this Court rejected Sony's first argument, finding that Adams' document requests covered the subject documents "so this is no refuge for Sony."  Memorandum and Decision at 16-17. The Court, however, relied on Sony's misrepresentations that it had produced the subject documents "to the extent that they exist."  Sony has yet to produce any such documents; Sony continues to assert that they do not exist.  If the documents do not exist, however, Sony has destroyed them.  No reasonable person could reach a different conclusion.

With all the outlined activity above, Sony would have Adams and this Court believe that communications between Sony and its suppliers regarding Adams and his patented technology do not exist, that its employees did not generate any internal correspondence and memorandum, and that Sony did not express any concerns to its suppliers when it learned of Toshiba's settlement and Adams' presentations. If those documents do not now exist, then the only conclusion that anyone can reach is that Sony has destroyed them.  Sony has not produced the notes of any of the participants at the meetings.  Sony's documents do not include correspondence with Sony's suppliers or outside experts, or any of the internal activities that the two meeting, jigs, and exchange of correspondence generated.

The categories of documents that had to exist at one time include the following:

1. **Documents relating to Sony's testing to determine if Sony had defects in their computers;**

**2. Documents relating to Sony's product liability investigation relating to computer defects and modification of Sony's computers;**

**3. Correspondence between Sony and its suppliers regarding Adams and/or his patented technology;**

**4. Correspondence between Sony and its suppliers regarding Sony's defective computers and certifications that Sony's computers were not defective;**

**5. Correspondence between Sony and its outside design experts relating to Adams technology; and**

**6. Documents relating to Sony's decision whether to license Adams' technology.**

As set forth in this Court's numerous Orders from the Gateway litigation[1], these documents are not privileged, and Adams' discovery requests certainly cover them.

On May 1, 2007, Dr. Adams, his counsel, and Sony's in-house and litigation counsel met in New York City. Adams outlined the prior discussions, correspondence between the parties, and the prior transfer of the jigs. Once again, Sony denied the existence of any documents memorializing those events, or resulting from them. Thus, Adams has only one recourse – the present motion for spoliation of evidence.

---

[1] E.g., Gateway Dkt No. 117 (Order Re Motion to Compel Documents Improperly Withheld on the Basis of Privilege); Dkt No. 131 (Sealed Order Granting Motion to Compel Documents Improperly Withheld on the Basis of Privilege); Dkt No. 136 (Order Granting Motion to Compel Documents Improperly Withheld on the Basis of Privilege); Dkt No. 268 (Memorandum Decision Affirming Magistrate's Sealed Order Granting Motion to Compel Documents Withheld Based on Privilege); Dkt No. 346 (Sealed Report and Recommendations by Judge Nuffer Re: Gateway's Possession of Adams' Detector and Designation of Consulting Experts); Dkt 484 Memorandum Decision and Order on De Novo Review of Magistrate Judge's Reports and Recommendations and Imposing Sanctions) As this Court is aware, Sony sought to intervene in the Gateway litigation [Dkt No. 568] and received copies of all of these Orders including the Sealed Orders [Dkt Nos. 581 and 582].

The foregoing facts firmly establish that documents exist, or existed at one time, and that Sony either lost or destroyed them.  This is not only a permissible inference under the facts, but the only conclusion that anyone can reach.  Sony has had every opportunity to produce its documents, and Sony has chosen not to do so.  Sony should have judgment entered against it.

This Court has warned every party involved in this line of lawsuits, starting with Gateway, that it will not tolerate the destruction of evidence.  Sony was clearly put on notice by this Court's March 6, 2006 Memorandum Decision and Order that this Court will impose terminating sanctions under the right set of circumstances.  Dkt No. 484, Memorandum Decision and Order at 17-18 (including the "warn[ing] that if there is further evidence that is missing or tardily disclosed, or if it engages in further conduct that impedes the disclosure or discovery of relevant evidence further severe sanctions, including entry of judgment, shall be imposed.")  On May 22, 2006, Sony, and the other defendants in this litigation, moved to intervene in the Gateway litigation and have the Gateway record unsealed.   [Dkt No. 568]   Thus, Sony obtained all of the sealed pleadings and Orders from the Gateway litigation [Dkt Nos. 581 and 582], including the warning set forth in Dkt. No. 484.

## III.   ARGUMENT

"Federal courts possess inherent powers necessary 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"   Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc., 1998 WL 68879, at *5 (10th Cir. February 20, 1998) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991).  The underlying policy for sanctions is to: 1) eliminate the prejudice to an innocent party; 2) punish the

offending party; and 3) to deter future misconduct.  See Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976).  To further those policies, under Federal Rule of Civil Procedure 37, the Court may impose fines, jury instructions adverse to the offending side, or dismissal with prejudice (or default judgment) if the circumstances of discovery misconduct so warrant.  See Roadway Express, Inc. v. Piper, 447 U.S. 752, 763 (1980).

Indeed, the law is well settled in this Circuit and this District that entry of judgment is an appropriate remedy for serious "discovery violations" pursuant to Federal R.Civ.P. 37(b)(2)(C) and 37(d).  LaFleur v. Teen Help, 342 F.3d 1145, 1151 (10th Cir. 2003) (affirming Judge Stewart's entry of judgment for discovery abuse).

Imposition of sanctions for spoliation involves consideration of:  "(1) the degree of culpability of the party who lost or destroyed the evidence, and (2) the degree of actual prejudice to the other party."  Jordan F. Miller Corp., 1998 WL 68879, at *4.  In deciding whether to enter judgment because of discovery violations such as spoliation, the Court should consider several factors.  "These factors do not constitute a rigid test; rather, they represent criteria for the district court to consider prior to imposing dismissal as a sanction."  Ehrenhaus v. Reynolds, 965 F.2d 916, 921 (10th Cir. 1992).  These factors include:  (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) warnings to the non-complying party; and (5) the efficacy of lesser sanctions.

### A.    Sony Had a Duty to Preserve

Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case.  Smith v. United States, 293 F.3d 984, 988 (7th Cir. 2002).  Spoliation

"encompasses a third party's intentional or negligent destruction or loss of tangible evidence, which destruction or loss impairs a person's ability to prove or defend a prospective civil action." Talmadge v. State Farm Mut. Auto. Ins. Co., 1997 WL 73476, at *3 (10th Cir. February 21, 1997).   The power to punish parties for spoliation of evidence is based on the litigant's duty "to preserve evidence that he knows or should know is relevant to imminent or ongoing litigation." Jordan F. Miller Corp., 1998 WL 68879, at *5.

"The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." Silvestri v. General Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001).   Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy, and put in place a "litigation hold" to ensure the preservation of relevant documents. Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 218 (S.D.N.Y. 2003).

Thus, the initial inquiry is whether Sony was on notice to preserve the specific documents, and when that duty arose.   Sony was on notice of Adams' patented technology since at least November 7, 2000, when Sony representatives met with Adams and his attorney to, in part, discuss a possible license of the patents-in-suit. Sony was again put on notice when Sony's General Counsel received Mr. Phillips' letter of August 18, 2003 attached hereto as Exhibit D.  Indeed, in the August 18, 2003 letter, Mr. Phillips put Sony on notice that "Sony is also infringing Dr. Adams' patents by selling those devices."  Moreover, Sony was surely on notice once Adams formally filed suit against Sony on May 12, 2005.

Here, astonishingly, Sony's position is simply that there are no responsive documents, and Sony has provided no explanation for their absence.  Sony would lead the Court to believe that: (1) not a single document, e-mail, note, or memo arose out of either of its meetings with Adams in 2000 and 2001; (2) not a single document, e-mail, or memo arose out of any investigation Sony performed on its computers regarding the FDC problems, or any later modification of its defective computers; (3) not a single document, e-mail, or memo arose out of any communications Sony had with its suppliers regarding the FDC problems; (4) not a single document, e-mail, or memo arose out of any communications Sony had with its design experts relating to Adams' technology; and (5) not a single document, e-mail, or memo arose out of any discussions occurring internally within Sony regarding whether to license Adams' technology.  (Conversely, apparently, Sony argues that none of the communications in (2), (3), (4), and (5) ever occurred, and hence there are no responsive documents.)

Sony's position is ludicrous and outrageous; it is even more ludicrous and outrageous that Sony would expect this Court and Adams to believe that there is not a single document relevant to any of the above events.  The only conclusion Adams can reach is that Sony destroyed any of those relevant documents.  Additionally, because the absence of these items is unexplained, there is no way of knowing if they became unavailable before or after the filing of Adams' lawsuit.

**B.    Adams' Has Been Prejudiced by Sony's Misconduct**

A party has the right to prosecute its case in the way it deems fit based on all available relevant evidence. See Hickman v. Taylor, 329 U.S. 495, 507, 67 S. Ct. 385, 91 L. Ed. 451 (1947) (stating "mutual knowledge of all the relevant facts . . . is essential

14

to proper litigation."); see also Fed. R. Civ. P. 26 Advisory Notes of 1983 Am. (stating that parties should have all "discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case").  The documents destroyed by Sony are critical to Adams' infringement claims because:  (1) Sony's testing of the FDCs is directly and highly relevant to its infringement of Adams' technology; (2) Sony's investigation and modification of its computers is likewise highly relevant to its infringement of Adams' technology; (3) Sony's correspondence with its suppliers is highly relevant to Adams' claims of infringement; (4) Sony's correspondence with its outside design experts is likewise highly relevant to Adams' claims of infringement; and (5) documents relating to Sony's decision whether to license Adams' technology go directly to Adams' claims of willful infringement.

Additionally, the availability of other evidence does not minimize the absence of those documents.  The only other method by which the evidence can become available in this case is through a memory test of individuals involved in the events.  Given that these events happened as much as seven years ago, Sony has effectively stymied Adams' capacity to properly prove its case, especially with respect to the issue of willfulness of infringement, since memories fade over time, and no individual could remember the level of detail likely included in correspondence and testing documentation.

### C.    Sony has Acted in Bad Faith and Has Interfered With the Judicial Process

As outlined above, Sony has destroyed, lost, or withheld documents; Sony has lied to Adams; and Sony has lied to this Court.  More importantly, Sony has completely thwarted Adams from obtaining any evidence as to the willfulness of Sony's unlawful

conduct.  Sony has greatly interfered with the judicial process and has caused great harm.  Thus, Adams respectfully submits that the requested sanctions are appropriate and necessary.

### D.    Default Judgment is the Proper Sanction

This Court has discretion in imposing sanctions under Fed. R. Civ. Proc.  37 or pursuant to its inherent power. Chambers, 501 U.S. at 44-45.   Under Rule 37, if spoliation occurs, a court may "dismiss[] the action or proceeding or any part thereof, or render[] a judgment by default against the disobedient party."  The choice of default judgment as a sanction is within the discretion of the court upon the showing that the disobedient party acted willfully, or in bad faith, in failing to comply with rules of discovery or with court orders enforcing the rules. National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 640 (1976); Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 705 (1982).

For example, in the Tenth Circuit, entry of judgment is appropriate when a party's "failure to provide discovery was the result of a deliberate, dilatory course of conduct by the defendant's counsel for the defendants' benefit," FDIC v. Daily, 973 F.2d 1525, 1529 (10th Cir. 1992), or where a party "willfully provided false and misleading answers on a continual basis during the discovery process." Archibeque v. Atchinson, Topeka and Santa Fe Railway Company, 70 F.3d 1172, 1173 (10th Cir. 1995).  Judgment is further appropriate where a party or "counsel's actions were strategic rather than merely inadvertent." Daily, 973 F.2d at 1525.

The courts have the inherent power to enter a default judgment as punishment for a defendant's destruction of documents:

> Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information. While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.

Telectron, Inc. v. Overhead Door Corp., 116 F.R.D. 107, 126 (S.D. Fla. 1987) (quoting

Wm. T. Thompson v. General Nutrition, 593 F.Supp. 1443, 1455 (C.D. Cal. 1984))  see

also Computer Associates Int'l, Inc. v. American Fundware, Inc., 133 F.R.D. 166, 168

(D. Colo. 1990) (destruction of computer source code after infringement litigation

began); Greviskes v. Universities Research Ass'n, Inc., 417 F.3d 752, 759 (7th Cir.

2005) (dismissal with prejudice particularly appropriate in case where plaintiff engaged

in fraudulent misconduct in course of discovery, and attempted to conceal records);

Ladien v. Astrachan, 128 F.3d 1051, 1057 (7th Cir. 1997) (inaccurate verification that

document production was complete); Crown Life Insurance. Co. v. Craig, 995 F.2d

1376, 1383 (7th Cir. 1993) (statement misrepresenting that all responsive documents

had been produced).

The courts of other circuits have even granted judgment against a party that has

engaged in spoliation of evidence *in the absence of bad faith on the part of spoliator*.

E.g., Allstate Insurance Co. v. Sunbeam Corp., 53 F.3d 804, 806-07 (7th Cir. 1995):

Unigard Sec. Ins. Co. v. Lakewood Eng'g, 982 F.2d 363, 368-69 (9th Cir. 1992).  The

Court need not go that far here because Sony has acted in bad faith.

For example, in <u>Stubli v. Big D International Trucks, Inc.</u>, 810 P.2d 785 (Nev. 1991) the Nevada Supreme Court upheld the entry of judgment against the plaintiff who had destroyed a furnace.  The Nevada Supreme Court held:

> Relevant evidence in this case has irreparably lost due to the willful actions of Stubli's agents.  A lesser sanction, short of deeming respondents' theory admitted by the offending party and granting summary judgment in respondents' favor, will not compensate for that loss.  Although dismissal precludes adjudication on the merits and penalizes Stubli for the misconduct of his attorney and expert, such consequences are unavoidable an are outweighed by the need to remedy the unfair litigation practices employed in this case, and the benefit of deterring similar abuses in future cases.

810 P.2d at 314.

Another court entered judgment against a party whose son "delet[ed] computer data" that was relevant to a claim for breach of fiduciary duty.  <u>Playball At Hauppauge, Inc. v. Narotzky</u>, 745 N.Y.S.2d 70, 72 (N.Y. 2002).  Under this reasoning, a court can impose severe sanctions depending on the offending party's subjective state of mind (for willfulness or bad faith) or how the objective "reasonable person" would view their conduct (fault).  <u>See e.g.</u> <u>Long v. Steepro</u>, 213 F.3d 983, 987 (7th Cir. 2000).  These cases demonstrate that courts will not tolerate the spoliation of evidence, and that parties that lose or destroy evidence should have judgment entered against them.

Although severe, such recourse "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." <u>National Hockey League</u>, 427 U.S. at 643.

E.      **Sony Has Received Adequate Warning**

As outlined in the statement of facts above, this Court has sanctioned Gateway and made its position crystal clear regarding spoliation.  Sony sought to intervene in the Gateway litigation and obtained copies of all of this Court's previous Orders, both sealed and unsealed, and Sony cannot claim ignorance.  Moreover, Magistrate Judge Nuffer, has reviewed Adams' Motion to Compel against Sony, and has warned Sony that Adams' requests cover the subject documents.  Under these circumstances, Sony has had ample warning of the consequences of spoliation.

F.      **Lesser Sanctions Do Not**
        **Provide an Adequate Remedy**

Other remedies available to the Court include:

(1)     A jury instruction directing the jurors to infer that the spoliated evidence would have been in Adams' favor, and adverse to Sony;

(2)     A finding that Sony has engaged in discovery misconduct;

(3)     A jury instruction directing the jurors to infer that the spoliated evidence would have supported a finding of willful infringement; and

(4)     Payment by Sony of Adam's attorney's fees related to the filing of this motion;

However, these remedies do not rise to the level of misconduct by Sony.  They do not offer any punishment should Sony continue to litigate and prevent Adams from proving its case.  In this case, Sony's conduct shows such blatant contempt for this Court, and a fundamental disregard for the judicial process, that the only adequate sanction is a default judgment.  Entering a default judgment against Sony will send a strong message to other litigants, who scheme to abuse the discovery process and lie to the Court, that

such behavior is intolerable and sanctionable. Furthermore, any sanction less than default will not cure the prejudice already suffered by Adams.

## IV.    **<u>CONCLUSION</u>**

As set forth above, Sony has engaged in a pattern of spoliation.  Sony has lost or destroyed some of the most critical evidence in this case.  This Court should enter judgment against Sony for patent infringement and schedule a trial for damages.

DATED:  May 29, 2007.

HOWARD, PHILLIPS & ANDERSEN


<u>s/Gregory D. Phillips</u>
By: Gregory D. Phillips
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing **ADAMS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SANCTIONS AGAINST SONY** was served on the following via email on May 29, 2007.

Benjamin J. Bradford
Matthew W. Neumeir
Reginald J. Hill
Jenner & Block
One IBM Plaza
330 North Wabash Avenue
Chicago, Illinois  60611

Terry E. Welch
Darren K. Nelson
Parr Waddoups Brown Gee & Loveless
185 South State Street, Suite 1300
Salt Lake City, Utah  84111-1537

**Attorneys for Dell, Inc.**

Michael A. Jacobs
Parisa Jorjani
Shane Brun
Morrison & Foerster LLP
425 Market Street
San Francisco, California  94105-2482

Sterling A. Brennan
David R. Wright
Janna Lewis
Workman Nydegger a
  Professional Corporation
1000 Eagle Gate Tower - 60 E. South Temple
Salt Lake City, Utah  84111

**Attorney for Fujitsu Computer Systems Corp. and Fujitsu Limited**

Michael S. Dowler
Brian L. Jackson
Howrey LLP
1111 Louisiana – 25th Floor
Houston, Texas 77002

Jeremy O. Evans
Huntsman Evans
  Christansen & Lofgran, PLLC
3995 South 700 East, Suite 400
Salt Lake City, Utah 84107

**Attorneys for MPC Computers, LLC**

Kevin B. Johnson
Michael William Gray
Todd M. Briggs
Quinn Emanuel Urquhart Oliver
  & Hedges
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA  94065

Rick B. Hoggard
Arthur B. Berger
Ray Quinney & Nebeker P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385

**Attorneys for Sony Electronics Inc.**

Erik A. Olson
J. Mark Gibb
R. Stephen Marshall
Durham Jones & Pinegar
111 E Broadway, Suite 900
Salt Lake City, Utah 84111
(801)415-3000

**Attorneys for Third-Party Defendant Asutek Computer and Asus Computer International**

Gary C. Ma
Richard Chae
Sean P. DeBruine
Yitai Hu
AKIN GUMP STRAUSS HAUER & FELD
TWO PALO ALTO SQ
3000 EL CAMINO REAL STE 400
PALO ALTO, CA 94306
(650)838-2026

Christopher B. Snow
Jennifer A. James
Neil A. Kaplan
CLYDE SNOW SESSIONS & SWENSON
ONE UTAH CENTER 13TH FL
201 S MAIN ST
SALT LAKE CITY, UT 84111-2216

**Attorney for Third-Party Defendant Winbond Electronics Corporation**

**s/Julianne Partridge**
Howard, Phillips, & Andersen

22