AIN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| PHILLIP M. ADAMS & ASSOCIATES, L.L.C., a Utah Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>DELL, INC., FUJITSU LIMITED, FUJITSU COMPUTER SYSTEMS CORP., MPC COMPUTERS, LLC, SONY ELECTRONICS INC., WINBOND ELECTRONICS CORP., ASUSTEK COMPUTER, INC., ASUS COMPUTER INTERNATIONAL, QUANTA COMPUTER, INC, QUANTA COMPUTER USA, INC., QUANTA MANUFACTURING, INC., MICRO-STAR INTERNATIONAL CORPORATION, LTD., MSI COMPUTER CORPORATION, NATIONAL SEMICONDUCTOR CORPORATION,<br><br>Defendants.<br><br>And Related Third-Party Claims. | MEMORANDUM DECISION AND ORDER:<br>• GRANTING IN PART [492] MOTION FOR TERMINATING SANCTIONS AGAINST ASUS BASED UPON ASUS' SPOLIATION OF EVIDENCE OF ITS PIRACY;<br>• GRANTING IN PART [559] MOTION TO STRIKE; and<br>• DENYING [604] MOTION TO STRIKE<br><br>Case No.  1:05-CV-64 TS<br><br>The Honorable Ted Stewart<br><br>Magistrate Judge David Nuffer |

Phillip M. Adams & Associates (Adams) moved for entry of judgment for liability against defendants ASUSTEK Computer, Inc. and ASUS Computer International (collectively ASUS) based upon ASUS' alleged spoliation of evidence.[1]  ASUS has responded with two motions to strike evidence upon which Adams' motion relies for purposes of this motion.[2]  This order grants the motion for sanctions in part; grants in part the motion to strike the Woon Report for purposes of this motion; and denies the motion to strike certain emails and the printout of program headers.

---

[1] Adams' Motion for Terminating Sanctions Against ASUS Based upon ASUS' Spoliation of Evidence of Its Piracy, docket no. 492, filed April 17, 2008.

[2] ASUSTeK's Motion to Strike Exhibit E to Plaintiff's Memorandum in Support of Its Motion for Terminating Sanctions, docket no. 559, filed June 30, 2008; ASUSTeK's Motion to Strike Exhibits A, B, C, D and I and Related (footnote continued)

# Table of Contents

NATURE OF THE CASE ...................................................................................................1

RELEVANT FACTS ON THIS MOTION .......................................................................2

    Assertion of Infringement ........................................................................................3
        Materials from Winbond................................................................................4
        Materials from ASUS....................................................................................6
        Conclusions from the Evidence – and Adams' Arguments ...................................7

    Assertion of Destruction of Evidence ......................................................................9
        ASUS' Data Resources ................................................................................10

MOTIONS TO STRIKE ...................................................................................................11

    Waiver of Motion to Strike Emails and Program Header Printouts ..................................12

    Authentication................................................................................................12

    Hearsay ........................................................................................................15
        Woon Report................................................................................................15
        Winbond Emails............................................................................................17
        Program Headers...........................................................................................18

    Confusion and Prejudice – Program Headers ...................................................19

    Summary of Remaining Evidence on this Motion............................................20

MOTION FOR SANCTIONS ...........................................................................................22

    Unavailable Evidence .................................................................................22

    Duty to Preserve.........................................................................................24
        Adams' Notice to ASUS.............................................................................24
        Adams' Delay................................................................................................25
        When Did the Duty To Preserve Arise? ....................................................25

    Safe Harbor .................................................................................................27

    What Sanction is Appropriate? ...................................................................29
        Culpability.....................................................................................................29
        Prejudice .......................................................................................................32

ORDER ..............................................................................................................................33

---

Arguments in Plaintiff's Memoranda in Support of Its Motion for Terminating Sanctions Against ASUSTeK, docket no. 604, filed August 21, 2008.

## Nature of the Case

In the late 1980s, Dr. Phillip Adams identified a defect in the NEC 765A floppy disk controller (FDC) which was a part of most personal computers.[3] Dr. Adams believed that the defect in the FDC could cause the random destruction or corruption of data without proper notification to the user that data had been destroyed, which potentially could lead to serious consequences.[4] After his discovery of the defect, Dr. Adams devoted substantial amounts of time and effort to developing various solutions to detect and resolve FDC defects.[5] Dr. Adams decided to patent the computer technology resulting from his development efforts, with the first patent application being filed in 1992.[6] To date, there have been at least five patents issued as the result of Dr. Adams' efforts.[7] Each of those patents has been purportedly assigned to Phillip M. Adams & Associates LLC, the Plaintiff in this case.[8]

The FDC-related defects have given rise to multiple lawsuits over the past several years, one of which culminated in October 1999 with a $2.1 billion class-action settlement by Toshiba.[9] In the aftermath of that class-action settlement, interest in Adams' technology allegedly increased resulting in licenses and infringement. Alleged misuse of Adams' technology has given rise to Adams' instant lawsuit. Adams previously filed a lawsuit against Gateway, Inc.

---

[3] Second Amended Complaint at 3, docket no. 222, filed January 4, 2007.

[4] *Id.*

[5] *Id.* at 2.

[6] U.S. Patent No. 5,379,414.

[7] Second Amended Complaint at 2.

[8] *Id.* at 3.

[9] Adams' Memorandum in Support of Its Motion for Terminating Sanctions Against ASUS Based upon ASUS' Spoliation of Evidence of Its Piracy (Memorandum in Support) at iv, docket no 493, filed April 17, 2008.

(Gateway) in this court[10] on similar grounds.  That case (Gateway Case) was litigated long and hard but settled at trial.[11]

In this case, Adams alleges that ASUS, among other defendants, has infringed on his patents.  Adams claims that ASUS obtained Adams' programs in early 2000; illegally used them to test ASUS motherboards; and reverse-engineered new software which it tried to patent.[12] Adams claims that ASUS required Winbond, a chip manufacturer, to modify the chips Winbond sold to ASUS, again using Adams' technology.[13]  ASUS and Winbond are upstream suppliers to computer manufacturers.[14]

### Relevant Facts on this Motion

Adams alleges that "ASUS has destroyed the source code and documents relating to [two] test programs" created with "Adams' patented and proprietary technology . . . ."[15]  Adams also claims ASUS destroyed "documents that would have conclusively demonstrated ASUS' piracy."[16]

Adams' stated factual basis for this motion is twofold:  first, that ASUS has illegally used Adams' patented software; and second, that ASUS has destroyed evidence of that use.  The first assertion is identical to the liability issue in this case.  The second assertion is premised on the first:  Assuming ASUS *used* Adams' software, ASUS' *failure to produce evidence* of that use is

---

[10] *Adams v. Gateway*, Case No. 2:02-CV-106 TS, District of Utah.

[11] Minute Entries, docket nos. 563 and 564, filed April 4, 2006, *Adams v. Gateway*, Case No. 2:02-CV-106 TS, District of Utah.

[12] Memorandum in Support at iv-v.

[13] *Id.* at v.

[14] *Id.* at vi-vii.

[15] *Id.* at 1.

[16] *Id.*

sanctionable spoliation.  Adams has no direct proof of destruction of evidence but is inferring destruction or withholding of evidence.  Since Adams is convinced that ASUS infringed, Adams is also convinced that failure to produce evidence of infringement is sanctionable.

In discovery and ensuing correspondence to resolve discovery disputes, Adams requested that ASUS produce:

- Adams' detector programs;

- ASUS' detector programs that are based on Adams' detector;

- Correspondence with ASUS' suppliers and customers; and

- Documents relating to testing and modifications.[17]

In a protective order that limited some of Adams' discovery requests sent to ASUS, the court effectively approved Adams' requests that the foregoing materials be produced.[18]  When ASUS' production of items in the foregoing categories was meager, Adams filed this motion.

## Assertion of Infringement

Adams' first assertion is that ASUS "obtained Adams proprietary test programs . . . and then illegally used, dissected, reproduced and promulgated those programs and their derivatives . . . ."[19]

> ASUS' engineer, Sam Yang, reverse–engineered the Adams test program . . . and subsequently wrote his own testing programs that ASUS named "ifdc.exe" and "w2sec.exe."  ASUS then required Winbond to modify its chips and to replace the defective Rev. C chip with an infringing Rev. G chip on its motherboards.  ASUS

---

[17] The various requests for production are summarized in Memorandum in Support at xiii.  *See* ASUS' corresponding narrative in ASUS' Memorandum in Opposition to Adams' Motion for Terminating Sanctions Against ASUSTeK (Memorandum in Opposition) at xviii, docket no. 561 filed June 30, 2008.

[18] Memorandum Decision and Order Granting in Part ASUSTeK's Motion for a More Definite Statement and Motion for Protective Order . . . ., docket no. 431, filed January 22, 2008.

[19] Memorandum in Support at iv.

directed all this activity under the threat of taking its business away from Winbond.[20]

To support anassertion of infringement, and to lay the foundation for a claim of spoliation, Adams relied in the original briefing on materials obtained from Winbond in the Gateway litigation.[21] These are four emails; a test report; a program file; and headers from source code files. Adams also relied on an ASUS patent application. Later, Adams supplemented his briefing with two emails produced by ASUS.

**Materials from Winbond**

A listing of the emails and the language Adams cites to show that ASUS used a test program follows:

| Exhibit | Cited Language |
|---|---|
| Email  PM Chen to YC Lu and others, January 31, 2000 4:39 PM[22] | We have tested [Winbond chip] 787IF with Asus' special S/W and found it fail [sic] in even worse condition.<br>This matter is "LIFE-OR-DEATH" to the I/O business. We can never overemphasize it…. |
| Email from PM Chen to YC Lu and others, January 27, 2000 4:07 PM[23] | The solution should be in two ways –<br>1) HP Case –<br>Solution to solve the FDC failure for those PC shipped to the market or help HP/Asus to win the suit.<br>2) I/O revision -- How to fix our bug? Asus people just called me and asked us to provide the schedule… |

---

[20] Memorandum in Support at v (emphasis omitted and paragraphs collapsed).

[21] *Id.* at x.

[22] Exhibit A to Adam's Memorandum in Support, filed under seal in docket no 494, filed April 17, 2008. The document has Bates No. WINBO 00075.

[23] Exhibit B to Adam's Memorandum in Support, filed under seal in docket no 494, filed April 17, 2008. The document has Bates No. WINBO 00076.

| Exhibit | Cited Language |
|---|---|
| Email from PM Chen to LH Chen and others, January 27, 2000 1:41 PM[24] | Some HP people are visiting Asus to identify the failure mode…HP, Asus, Winbond, we have to treat this quite carefully and with highest priority to solve this headache. |
| Email LH Hsu to YC Peng and others February 8, 2000 4:35 PM[25] | The U.S. 5379414 [Adams'] patent has claim [sic] this similar solution.  I will discuss with AE00 to avoid infringement. |

While some of the foregoing documents refer to ASUS, they are all "emails between Winbond employees."[26]

The fifth document relied on in Adams' original briefing (the Woon Report) is written by a Gateway engineer who is alleged to have "participated in testing" with ASUS.[27]  The portion of the report cited by Adams is:

| Test Report, YC Woon July 31, 2000[28] | Apparently the utility's algorithm originated from one of IBM's consulting firm.[sic]  ASUS wrote software using the same algorithm and use it to test the boards in ASUS.  As this is a propriety software, and also due to its patented algorithm, the software could not be released to be used outside of ASUS.  Winbond apparently got hold of the software through ASUS as they bought the same Winbond chip from them. |

The Woon Report refers to two programs which comprise a utility which the report states "ASUS wrote using the same algorithm" that "originated from one of IBM's consulting firm.

---

[24] Exhibit C to Adam's Memorandum in Support, filed under seal in docket no 494, filed April 17, 2008.  The document has Bates No. WINBO 00077.

[25] Exhibit D to Adam's Memorandum in Support, filed under seal in docket no 494, filed April 17, 2008.  The document has Bates No. WINBO 00079.

[26] Memorandum in Support at viii.

[27] Memorandum in Support at ix.

[sic]"[29]  Dr. Phillip Adams was a former IBM employee and Adams claims that "Winbond

typically referred to Dr. Adams as "IBM's consulting firm.""[30]  The two programs which the

Woon Report says ASUS wrote are referenced in the report as "ifdc.exe" and "w2sec.exe."[31]  All

the foregoing documents are from the year 2000.

In the Gateway litigation in late 2005, Winbond identified "an error detection program

from ASUS."[32]  In 2008, after some dispute, Winbond produced two programs, "ifdc.exe" and

"w4sec.exe"[33] that Winbond says came from ASUS.  This was executable code; not source code.

Adams also relies on printouts of the headers from the "ifdc.exe" and "w4sec.exe" programs. [34]

"Both programs include the notation: 'Programming by Sam Yang@ASUS.'"[35]

### Materials from ASUS

Adams also relies on a patent application by ASUS[36] in late 2001 showing that ASUS

attempted to patent "[a] method for preventing data corruption in a Floppy Diskette

Controller . . . ."[37]  This document was produced by ASUS.[38]  "This application identifies the

inventor of its subject matter as Jin-Hsin Yang, also known as Sam Yang."[39]

---

[28] The Woon Report is Exhibit E to Adam's Memorandum in Support, filed under seal in docket no 494, filed April 17, 2008.

[29] Woon Report at 1

[30] Memorandum in Support at ix.

[31] Woon Report at 2.

[32] Letter from Alfredo A. Bismonte to John R. Posthumus and Greory Philipps [sic], November 4, 2005, attached as Exhibit H to Memorandum in Support.

[33] Memorandum in Support at xii.

[34] Adams attached the program header printouts as Exhibit I to Memorandum in Support.

[35] Memorandum in Support at xii.

[36] The patent application is attached as Exhibit G to Memorandum in Support.

[37] *Id.* at 1.

[38] Memorandum in Support at xi.

[39] *Id.* at xi.

ASUS produced a software program "ifdc.exe"[40] but only in executable form.[41]  No source code[42] was produced.

In later supplemental briefing, Adams has identified two emails produced by ASUS as providing further support for his position that ASUS used a detector.  In the first, Sam Yang states "I have finished the programming. The two programs is [sic] used to verify the FDC."[43]  The email attaches ifdc.exe and w4sec.exe and describes the technical detail of how these programs work.  Another email from Yang to the same recipient sent later that same day states "The program is updated. We can see the FDC problem easily by the two programs."[44]  This email attaches ifdc.exe and w2sec.exe.

### Conclusions from the Evidence – and Adams' Arguments

Adams has produced evidence which  shows that in late 2000 Sam Yang aka Jin-Hsin Yang, an ASUS employee, developed programs to test floppy disk controllers; that Winbond regarded ASUS' test software as "special" and thought there was some issue of infringement; and that a Gateway engineer believed that ASUS wrote the software based on an algorithm developed by an IBM consultant and that Winbond was using that software.

Adams' argument goes beyond this evidence, however.  Adams alleges *infringement* is demonstrated by these materials.

---

[40] Memorandum in Opposition at xx.

[41] Memorandum in Support at x.

[42]    A computer program's source code is the collection of files needed to convert from human-readable form to some kind of computer-executable form. The source code may be converted into an executable file by a compiler, or executed on the fly from the human readable form with the aid of an interpreter.

"Source Code," Wikipedia (last visited January 2, 2009).

[43] Email January 27, 2000 9:18 am, Sam Yang to Max Lu, attached as Exhibit 1 to Adams' Supplementation Regarding (1) ASUS' Spoliated and Infringing Detector, and (2) YC Woon's Test Report (Adams' Supplementation), docket no. 675, filed under seal December 29, 2008.

[44] Email January 27, 2000 1:26 pm, Sam Yang to Max Lu, attached as Exhibit 2 to Adams' Supplementation.

> Sometime in early 2000, ASUS *obtained* Adams proprietary test programs . . . and then *illegally used, dissected, reproduced and promulgated those programs* and their derivatives.[45]

> ASUS' engineer, Sam Yang, *reverse–engineered* the Adams test program that Adams had licensed to HP, and subsequently wrote his own testing programs that ASUS named "ifdc.exe" and "w2sec.exe."[46]

> This [patent] application shows beyond dispute that *ASUS had a copy of Dr. Adams' proprietary test programs, closely examined and reverse engineered those test programs, misappropriated the trade secrets* in them to create its own test programs, and then raced to the United States Patent Office to try to patent them.[47]

Adams does not support these infringement allegations with evidence.  There is no direct evidence that ASUS possessed or copied Adams' software or of "infringement" by the ASUS programs.  Adams has reports from third-parties that suggest infringement was a concern, and that ASUS was not the originator of its programs, but these are *suggestions* and are not substantial proof of infringement.

For its part and similarly without any foundation, ASUSTeK simply "denies that it misappropriated Adams' trade secrets or patented technology."[48]  "ASUSTeK disputes Plaintiff's unsupported contention that its employee, Sam Yang, relied on or referred to Adams' test programs when developing programs under the names 'ifdc.exe' and 'w2sec.exe.'"[49]

Adams also alleges, without providing evidence, that the ASUS patent application was rejected *because of* Adams' patent.  "[T]he USPTO rejected ASUS' patent because Adams had already patented the technology."[50]  ASUS disputes this, again without foundation.  "ASUSTeK

---

[45] Memorandum in Support at iv (emphasis added).

[46] *Id.* at v  (emphasis added).

[47] *Id.* at xii (emphasis added).

[48] Memorandum in Opposition at v.

[49] *Id.* at xi.

[50] Adams' Reply Memorandum in Support of Its Motion for Terminating Sanctions against ASUS (Reply Memorandum) at 3, docket no. 586, filed July 14, 2008.  See also Memorandum in Support at xii.

acknowledges that it filed the '367 patent application but this patent application was abandoned. ASUSTek disputes that the US Patent applications make any such connection between these programs and Adams' test programs."[51]

### Assertion of Destruction of Evidence

Adams similarly jumps from ASUS' *non-production* of evidence to the conclusion that ASUS has *destroyed* evidence.  Adams claims that in spite of numerous discussions of the issues on this motion, "ASUS failed to make any responsive production."[52]

> ASUS has failed and refused to produce FdcCheck.exe, HPFDC.exe, the source code for ifdc.exe, w2sec.exe, the source code for w2sec.exe, w4sec.exe, and the source code for w4sec.exe; and it has failed and refused to produce a single document or email relating to ASUS' development and use of these test programs. Specifically, ASUS has failed and refused any correspondence or related documents whatsoever for those programs or for ASUS' activities with its suppliers (e.g., Winbond) and its customers (e.g., Sony).[53]

It is true that most of the documentation on which Adams relies on this motion was produced by parties other than ASUS.  Only the executable "ifdc.exe;" the patent application; and the two Yang emails were produced by ASUS.  The two Yang emails were produced months after this motion was filed.

Because ASUS has produced so little, Adams therefore draws the conclusion that ASUS has destroyed evidence.

> ASUS's only response is that it has produced a large volume of documents.  That may be the case; but, it has not produced the most critical documents – those that relate to its misappropriation, its copying, and its willful behavior.  The only conclusion after all this time is that ASUS has destroyed critical evidence that it simply cannot show did not exist.[54]

---

[51] Memorandum in Opposition at xi.

[52] Memorandum in Support at xiv.

[53] *Id.* at x (emphasis omitted).

[54] *Id.* at xiv.

Adams makes a similar conclusion of destruction as to the source code for the test programs.  "ASUS has spoliated the most critical evidence in this case, e.g., test programs and related source code"[55]  "[S]ince ASUS has not produced it, the only conclusion is that ASUS has destroyed it."[56]

As expected, ASUSTeK "denies in the strongest terms Plaintiff's allegations it destroyed relevant evidence after being on notice of Plaintiff's claims . . . ."[57]  "[N]o documents, programs or source code have been discarded since ASUSTeK received some information of Plaintiff's potential claims against ASUSTeK in early 2005."[58]

### ASUS' Data Resources

ASUS extensively describes its email management and storage practices, to explain the nearly complete absence of emails related to the subject of this litigation.  First, ASUS says its email servers are not designed for archival purposes, and employees are instructed to locally preserve any emails of long term value.

> 35. ASUSTeK employees send and receive email via company email servers.
> 36. Storage on ASUSTeK's email servers is limited, and the company directs employees to download those emails they deem important or necessary to perform their job function from the company email server to their individual company issued computer.
> 37. ASUSTeK informs its employees that any email not downloaded to an employee's computer are automatically overwritten to make room for additional email storage on ASUSTeK's servers.
> 38. It is ASUSTeK's routine practice that its employees download to their individual computer those emails the employee deems important or necessary to perform his or her job function or comply with legal or statutory obligations.[59]

---

[55] *Id.* at iv.

[56] *Id.* at xi.

[57] Memorandum in Opposition at v.

[58] *Id.* at x.

[59] *Id.* at xxvi – xxvii.

Second, ASUS employee computers are periodically replaced, at which time ASUS places all archiving responsibility for email *and other documents* on its employees.

> 39. During the course of their employment, ASUSTeK employees return their individual company issued computers in exchange for newer replacement computers.
> 40. The hard drives of all computers returned to or exchanged with the company are formatted to erase all electronic information stored on these computers before they are recycled, reused or given to charity.
> 41. During a computer exchange, it is ASUSTeK's practice to direct its employees to download those emails and electronic documents from the employee's individual computer to the employee's newly issued computer that the employee deems important or necessary to perform his or her job function or comply with legal or statutory obligations.[60]

These practices may explain why ASUS has not produced certain emails which Adams has received from other parties. However, this information does not establish the good-faith nature of ASUS data management practices. This will be explored later in the discussion of sanctions.

### Motions to Strike

ASUS has moved to strike the four emails produced by Winbond, the Woon Report, the printouts of the program headers, and Adams' related arguments.[61] ASUS alleges these documents are not authenticated and are inadmissible hearsay. As to the program header printouts, ASUS also alleges "any probative value of the document is substantially outweighed

---

[60] *Id.* at xxvi – xxvii.

[61] ASUSTeK's Motion to Strike Exhibit E to Plaintiff's Memorandum in Support of Its Motion for Terminating Sanctions (First Motion to Strike), docket no. 559, filed June 30, 2008; ASUSTeK's Motion to Strike Exhibits A, B, C, D and I and Related Arguments in Plaintiff's Memoranda in Support of Its Motion for Terminating Sanctions against ASUSTeK (Second Motion to Strike), docket no. 604, filed August 21, 2008.

by the danger of unfair prejudice to ASUSTeK, confusion of the issues, and misleading the jury.[62]

### Waiver of Motion to Strike Emails and Program Header Printouts

Adams asserts that ASUS' motion to strike the emails and printouts of program headers is untimely because ASUS delayed its motion to strike those items until nearly two months after its other motion to strike which was filed with ASUS' opposition to the motion for sanctions.[63] ASUS claims that no rule sets a deadline for filing a motion to strike.[64]  On this point, the court agrees with ASUS and will rule on the motions to strike.

### Authentication

ASUS moves to strike exhibits which Adams uses to support the motion for sanctions because the exhibits are not authenticated.  The exhibits attacked are the four Winbond emails, the Woon Report and the program header printouts.

As to the Woon Report, ASUS states "Plaintiff has not submitted any declaration from YC Woon authenticating the notes.[65]  Further, there is no indication regarding the circumstances of their creation."[66]  The Woon Report has, however, been sufficiently authenticated by the deposition of Mike Holstein and emails sent and received near the time of the report which are

---

[62] Second Motion to Strike at 2 (citing Fed. R. Evid. 403, 801(a-c), 802 & 901).

[63] Adams' Opposition to ASUSTeK's Motion to Strike [Dkt. No. 604] Exhibits A, B, C, D and I (Opposition to Second Motion to Strike) at iii, 7-9, docket no. 615, filed September 8, 2008.

[64] Reply in Support of ASUSTeK's Motion to Strike Exhibits A, B, C, D & I and Related Arguments in Plaintiff's Memoranda in Support of Its Motion for Terminating Sanctions at 8-9, docket no. 623, filed September 22, 2008.

[65] ASUS is here using the term "notes" to mean the entire report.  The reply memorandum on this motion discusses the typewritten "pages" and handwritten "notes."  Reply Memorandum in Support of ASUSTeK's Motion to Strike Exhibit E to Plaintiff's Memorandum in Support of Its Motion for Terminating Sanctions (Reply Memorandum in Support of First Motion to Strike) at 3-7, docket no. 595, filed July 28, 2008.

referenced in that deposition.[67]  While Holstein admitted he did not know if Woon personally

wrote the report,[68] Holstein did authenticate the typed pages as Woon's report.  The report as

proffered by Adams consists of typewritten and handwritten pages.[69]  For this discussion, and the

balance of this order, the handwritten pages are ignored.

As to the emails, ASUS says "Plaintiff has not submitted a sworn testimony that the

emails attached as Exhibits A through D to its memorandum are authentic under Fed. R. Evid.

901, which requires a witness with "knowledge ... that a matter is what it is claimed to be."[70]

These emails were first produced by Winbond in the Gateway case, not in this case.[71]  Winbond

was not a party to the Gateway case, but is a party in this case.  While it is not clear on this

record whether Winbond also produced the emails in this case, it is clear that Winbond would

readily authenticate them again by production, which would be an effective authentication

against all parties to the case.[72]  Authentication for this motion is satisfied.

ASUS also makes an authentication objection to the program header printouts:

Plaintiff's explanation of the source of [the program header printouts] is 'A copy
of each programming header is attached hereto as Exhibit I'. Plaintiff's cursory
account of Exhibit I's origin is insufficient under Rule 901, which requires

---

[66] Memorandum in Support of ASUSTeK's Motion to Strike Exhibit E to Plaintiff's Memorandum in Support of its Motion for Terminating Sanctions (Memorandum in Support of First Motion to Strike) at 2, docket no. 560, filed June 30, 2008.

[67] Adams' Supplementation at 4-9.  Adams also argued for authenticity of the Woon Report by other means in Adams' Opposition to ASUSTeK's Motion to Strike [Dkt no. 559] Exhibit E to Plaintiff's Memorandum in Support of its Motion for Terminating Sanctions (Opposition to First Motion to Strike), docket no. 584, filed July 14, 2008.

[68] ASUSTeK's Response to Docket No. 675 at 7, docket no. 707, filed under seal January 23, 2009.

[69] Exhibit E to Memorandum in Support.

[70] Memorandum in Support of ASUSTeK's Motion to Strike Exhibits A, B, C, D and I and Related Arguments in Plaintiff's Memoranda in Support of Its Motion for Terminating Sanctions Against ASUSTeK (Memorandum in Support of Second Motion to Strike) at 2, docket no. 609, filed August 21, 2008 (citing Fed. R. Evid. 901(b)(1)).

[71] Opposition to Second Motion to Strike at v-vi and 2.

[72] *Id. Orr v. Bank of Am.,* 285 F.3d 764, 776 (9th Cir. 2002).

"evidence sufficient to support a finding that the matter in question is what its proponent claims."[73]

Again, the program files were produced by Winbond as having been received from ASUS, so the printouts are sufficiently authenticated for this motion.[74]

Adams notes that ASUS has not repudiated any of the documents, but has only claimed that they are not sufficiently authenticated.[75]  In addition, ASUS has not offered any evidence to contradict the emails, Yoon Report or program header printouts.  As ASUS argues, "ASUSTeK never claimed 'that there is no evidence' linking programs to its former employee Sam Yang.  Rather, ASUSTeK stated that Plaintiff's claim that Sam Yang authored the programs was not properly supported with admissible evidence." [76]  At this point, the authentication of the evidence offered by Adams is sufficient in light of ASUS' marginal challenge.

ASUS claims a nearly total absence of evidence, disputing any evidence produced by other parties.  The purpose of authentication is to buttress reliability and filter untrustworthy evidence.  ASUS is using the requirement of authentication, in conjunction with its internal evidence vacuum, to eliminate the only evidence available because ASUS will not repudiate, authenticate or contradict it.  That the evidence comes from other sources will be considered as to the weight the evidence may have, but ASUS should not be able to prevent consideration of the best evidence available, which has reasonable assurances of authenticity.

---

[73] Memorandum in Support of Second Motion to Strike at 2 (quotingMemorandum in Support at xii -xiii).

[74] Opposition to Second Motion to Strike at v; Memorandum in Support at xiii.

[75] Opposition to Second Motion to Strike at 1.

[76] ASUSTeK's Response to Docket No. 675 at 8, docket no. 707, filed under seal January 23, 2009.

## Hearsay

ASUS also claims each of the emails, the Woon Report and the program headers are inadmissible hearsay.  ASUS objects to the Woon Report because "YC Woon. . . has not offered a declaration or affidavit in this matter.  Further, there is no indication regarding the circumstances of their creation."[77]  As to the emails interchanged between Winbond employees, ASUS claims that there is no evidence the authors speak for Winbond, much less for ASUS.[78]  As to the program header printouts, ASUS objects that Adams has no evidence that "the programs were authored, sent or received by or from ASUSTeK."[79]

## Woon Report

Adams argues that the Woon Report is admissible hearsay under the business records exception[80] and as a non-hearsay admission of a party opponent.[81]

The Woon Report contains statements which would be adverse to the interests of ASUS, but no source is given for these statements.

> Apparently the utility's algorithm originated from one of IBM's consulting firm. [sic]  ASUS wrote software using the same algorithm and use it to test the boards in ASUS.  As this is a propriety software, and also due to its patented algorithm, the software could not be released to be used outside of ASUS.  Winbond apparently got hold of the software through ASUS as they bought the same Winbond chip from them.[82]

---

[77] Memorandum in Support of First Motion to Strike at 3.

[78] Memorandum in Support of Second Motion to Strike at 3-5.

[79] *Id.* at 6.

[80] Opposition to First Motion to Strike at 9 (citing Fed. R. Evid. 803(6)).

[81] *Id.* at 9, 11 (citing Fed. R. Evid. 801(d)(2)(D)).

[82] Woon Report.

The report itself has no indication that a representative of ASUS was present on July 31, 2000, during events reported.[83]  An admission must be made "by the party's agent or servant concerning a matter within the scope of the agency or employment . . . ."[84] The Woon Report is authored by a *Gateway* employee, and has not been shown to contain a statement of a person authorized to speak for ASUS,[85] so it is not a non-hearsay admission.

But the report is a business record, in spite of ASUS' arguments that Woon was on "special assignment."[86]  Such trips and events are regular business activity and reports are regularly made.  The emails surrounding the date of the report show that Woon's activities were regularly recorded and reported.[87]  Woon was reporting to others in Gateway on central business issues, so it can be presumed he had a duty to report accurately.  Indeed, this is apparent from the detail in the report.  And the typewritten report was created and emailed the same day as the events reported.[88]  Fed. R. Evid. 803(6) is satisfied.[89]

However, the critical statements are not Woon's observations of events, but his reporting of statements of unidentified persons.

> *Apparently* the utility's algorithm originated from one of IBM's consulting firm
> [sic].  ASUS wrote software using the same algorithm and use it to test the boards
> in ASUS.  As this is a proprietary software, and also due to it's [sic] patented

---

[83] Reply Memorandum in Support of First Motion to Strike at 9.

[84] Fed. R. Evid. 801(d)(2)(D).

[85] Reply Memorandum in Support of First Motion to Strike at 7-8.

[86] *Id.* at 8.

[87] Exhibit 28 to the Deposition of Mike Holstein, December 19, 2008, attached as Exhibit 3 to Adams' Supplementation.

[88] *Id.*

[89] (6) Records of regularly conducted activity.  A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

algorithm, the software could not be released to be used outside of ASUS. Winbond *apparently* got hold of the software through ASUS as they bought the same Winbond chip from them. [90]

As ASUS argues, these are "conclusory statements" without identifying the unknown declarant(s), and without providing foundation for the declarants' alleged statements."[91] The Woon Report is admissible hearsay as to what Woon reported and observed, but these specific statements are double hearsay.[92] On the current state of the record, there is insufficient foundation to establish a second hearsay exception, to give the "guarantees of trustworthiness"[93] that would enable these statements to be used against ASUS on this motion.

### Winbond Emails

The Winbond emails are admissible business records of Winbond. They reflect the activities and knowledge of Winbond and only mention involvement of ASUS. The emails do not contain conclusive statements similar to those in the Woon Report. Because the records themselves are the actual communications, they are timely recorded, regular activities; they memorialize events and conditions; and they have no indicia of untrustworthiness. They do not purport to reflect statements of unidentified third parties. ASUS objects to them because they may be offered for truthfulness of the statements contained in them. For example, ASUS asserts that in the first email "Plaintiff attempts to characterize an alleged FDC error as 'Life or Death' for the entire computer industry."[94] That "Life or Death" statement, like other statements in the emails is a statement of Winbond's perception. No one claims Winbond speaks for the industry.

---

[90] Woon Report (emphasis added).

[91] Reply Memorandum in Support of First Motion to Strike at 10.

[92] Fed. R. Evid. 805.

[93] Advisory Committee Notes to Federal Rules of Evidence, Art. III, Hearsay.

[94] Memorandum in Support of Second Motion to Strike at 3.

ASUS claims that in the third email, there is content that might be taken as a statement from ASUS.  "[W]e are informed by Asus that it does happen in our W83877TF [chip]."[95] ASUS' objection to the second email is similar.  These statements must be taken as Winbond's perception and understanding.  ASUS has offered nothing to indicate the information in these emails is untrustworthy.

Objecting to the fourth email, ASUS seems to protest too much.  ASUS asserts that the statement "The US 5739414 patent has claim [sic] this similar solution" tends to show "that ASUSTeK knew the 'solution' discovered was 'similar' to some unspecified part of the '414 patent."[96]  Nothing in that email mentions ASUS. The statement can only be read as Winbond's understanding.

The double hearsay problem found in the Woon Report does not exist in the Winbond emails, because they are statements of Winbond's activities, and while they reflect interaction with ASUS, they are written to record Winbond's perceptions, reactions and plans.  The Woon Report, by contrast, makes significant unsourced conclusions.  The emails, internal to Winbond, are not like the Woon Report of inter-company contact.

### Program Headers

Exhibit I is offered to buttress the connection of Sam Yang and ASUS to the programs ifdc.exe and w4sec.exe.  After the original briefing on this motion, ASUS has provided emails from Sam Yang which reference and enclose those programs.[97]  While these programs were not

---

[95] *Id.*at 4.

[96] *Id.* at 5.

[97] Email January 27, 2000 9:18 am, Sam Yang to Max Lu, attached as Exhibit 1 and email January 27, 2000 1:26 pm, Sam Yang to Max Lu, attached as Exhibit 2 to Adams' Supplementation.  Before producing those emails, ASUS took the position "that Plaintiff's assertion that ASUSTeK created  ifdc.exe and w2sec.exe is supported only by unauthenticated notes and hearsay of another party."  Memorandum in Opposition at viii.

produced with the emails and were produced by Winbond, not ASUS, they were produced by Winbond as having come from ASUS.[98]  Coupled with the emails, the program header printouts constitute admissible business records.  The arguments ASUS makes about authenticity and chain of custody all go to weight.[99]

**Confusion and Prejudice – Program Headers**

ASUS points out that the printout of the program headers is largely unintelligible,[100] and claims that Adams unjustifiably argues the printout proves much more than the document states.[101]

> The only legible text in Exhibit I includes the following: "IFDC.EXE," "has existed" and "Programming by Sam Yang @ ASUS" on the first page and "W4SEC.EXE" and "Programming by Sam Yang @ ASUS" on the second page. Plaintiff alleges that "IFDC.EXE," "W4SEC.EXE" and "Programming by Sam Yang @ ASUS" proves that Sam Yang, a former ASUSTeK employee, created programs labeled IFDC.EXE and W4SEC.EXE in Plaintiff's possession by copying Plaintiff's "patented algorithm."

---

[98] Memorandum in Support at xii.

[99] Memorandum in Support of Second Motion to Strike at 6.

[100] For example, the first page of the ifdc.exe program header printout is reproduced below:



[101] Memorandum in Support of Second Motion to Strike at 7.

Adams responds that "the text that is legible is certainly probative: it links Sam Yang, a former engineer at ASUS, to test programs misappropriating Adams' technology" and that since a judge, not a jury is deciding this motion, "the argument of unfair prejudice carries little weight."[102]  Adams is correct.  Computer gobblydegook is not confusing or prejudicial.

### Summary of Remaining Evidence on this Motion

Adams' evidence that the magistrate judge is considering on this motion includes:

- Sam Yang emails dated January 27, 2000 which enclosed programs ifdc.exe, w4sec.exe and w2sec.exe;

- Programs ifdc.exe, w4sec.exe produced by Winbond as having come from ASUS which have "Programming by Sam Yang@ASUS" in the headers;

- The application for patent application for "preventing data corruption by a floppy diskette controller" by ASUS/Sam Yang filed October 15, 2001;

- Winbond emails dated January 27, 31 and February 8, 2000, regarding floppy disk controller issues to show that:

  o Winbond regarded the issue as "'LIFE-OR-DEATH' to the I/O business;"

  o Winbond reported that ASUS had special software related to the issue;

  o Winbond believed the '414 patent had a "similar solution" and Winbond was concerned about infringement; and

  o Winbond had heard that HP representatives were visiting ASUS and HP and ASUS representatives were working together.

These specific facts are in an undisputed context, though the parties disagree on the significance of these contextual facts.  The Toshiba class action was settled in October 1999. Other class actions were then pending.  Thereafter, other computer and component manufacturers made significant inquiries into the floppy disk controller error issue.  Adams has

---

[102] Opposition to Second Motion to Strike at 7.

been involved in some suits and settlements with these manufacturers, and most of that activity commenced in the 2000 timeframe.

In presentation of argument on this motion the only documents ASUS has produced regarding the development of its floppy disk controller test software are the two Sam Yang emails (produced after the filing of this motion) and an executable copy of ifdc.exe.  ASUS has explained that it has no centralized storage of electronic documents, email or otherwise, and relies on individual employees to archive email (which will be deleted if left on the server) and electronic documents (which reside only on individual workstations).  ASUS has separately stated that Yang currently recalls writing programs regarding floppy disk controller errors;[103] that the second Winbond email evidences ASUSTeK's regular work with Winbond;[104] and that the fourth email shows "good faith efforts to avoid infringement."[105]

---

[103] Declaration of Vincent Hong, docket no. 556, filed June 30, 2008.

[104] Memorandum in Opposition at v.

[105] *Id.* at v.

**Motion for Sanctions**

The threshold issues on a spoliation motion include establishing (a) that evidence has been lost, destroyed or made unavailable and (b) that the party against whom sanctions are sought had a duty to preserve the evidence.  If those facts are shown, the determination of sanctions is subject to other standards.

**Unavailable Evidence**

Adams recites a list of materials ASUS would be expected to have, based on the facts before the court on this motion:

(1)    the ASUS test programs' source code and documentation of their development;

(2)    documentation of ASUS' FDC and motherboard testing activities in the 2000-2001  time period;

(3)    ASUS' communications with suppliers regarding testing of the FDC problems;

(4)    ASUS' communications with design experts relating to Adams' technology; and

(5)    documentation of discussions occurring internally within ASUS regarding whether to license Adams' technology.[106]

In addition, ASUS would be expected to have communications with its customers about the FDC error issue; efforts to resolve the issue; and documentation of its patent application process for its detector technology.

Adams claims that "[t]he evidence that Winbond provided in the Gateway litigation does not leave any doubt that these documents existed and that ASUS had them."[107]  Certainly, other parties have provided evidence that one would expect ASUS to have as well.  And the volume

---

[106] Memorandum in Support at 3-4.

[107] *Id.* at xiii.

and tenor of the Winbond communication and concurrent Yang emails would suggest ASUS should have far more evidence than it has produced in this case.

ASUS' own statements and productions highlight data that is missing.  "[N]o documents, programs or source code have been discarded since ASUSTeK received some information of Plaintiff's potential claims against ASUSTeK in early 2005."[108]  ASUS therefore admits that materials prior to 2005 could have been destroyed because of its information management practices.  ASUS has produced a CD with program files from the time at issue,[109] but somehow the ASUS source code at issue in this case was not available.

ASUS contacted each of the current employees identified by Adams as potentially aware of floppy disk controller errors in the pertinent timeframe; has interviewed them; and asked them to search their company-issued computers for related data.[110]  Most of them did not work on floppy disk controller errors, and "any documents from the 1999-2002 time period were discarded prior to early 2005 . . . pursuant to the company's routine practice of discarding unnecessary documents and information."[111]

The only former employee that ASUS describes contacting is Sam Yang, presumably because ASUS says "ASUSTeK is unaware of any employee who worked on the floppy disk controller overrun/under-run matters other than engineer Sam Yang."[112]  But without asking those other former employees, it is not possible to be certain they did not work on the project.

---

[108] Memorandum in Opposition at x.

[109] *Id.* at xix.

[110] *Id.* at xxx-xxxi.

[111] *Id.* at xxxi.

[112] *Id.* at xxxii.

So, due to ASUS' lack of inquiry we have no evidence from most of the former ASUS employees.

ASUS has had contact with former employee Sam Yang,[113] but Adams' counsel's attempts to contact him have been frustrated.[114]  Therefore Adams has nothing from the most central character in ASUS' work

### Duty to Preserve

The universe of materials we are missing is very large.  Indisputably, we have very little evidence compared to what would be expected.  The next issue is ASUS' duty to preserve evidence, and whether the lack of evidence is due to breach of that duty.  ASUS claims that its duty to preserve documents related to these claims arose only in early 2005.

### Adams' Notice to ASUS

In ASUS' own words,

ASUSTeK's retention of documents relating to the subject matter of this litigation and patents-in-suit has been influenced by the timing of Plaintiff's notice to ASUSTeK.[115]

On February 23, 2005, ASUSTeK first became aware that Plaintiff may assert a claim for patent infringement against ASUSTeK under the 002 Patent as a result of a letter  . . . delivered to ASUSTeK by Plaintiff's counsel . . . .[116]

While Adams' counsel wrote an earlier letter to ASUS, which was attached to the February 2005 letter ASUS says it "has no record of receiving that certain letter dated October 4, 2004 from Phillips to ASUSTeK . . . .[117]  With a benchmark date of February 23, 2005, ASUS

---

[113] Declaration of Vincent Hong at 5-8, docket no. 556, filed June 30, 2008.

[114] Opposition to Second Motion to Strike at vi.

[115] Memorandum in Opposition at 44.

[116] *Id.* at xviii

[117] *Id.* at xix

claims it has fully complied with its duties to preserve documents.  "Since February 23, 2005, when Plaintiff first notified ASUSTeK of potential infringement claims, ASUSTeK has not destroyed any evidence relevant to such claims."[118]

### Adams' Delay

ASUS claims that Adams' delay in giving notice and bringing suit is the reason it has so little documentation.  "ASUSTeK's ability to locate and produce documents from 2000/2001 has been significantly inhibited by Plaintiff's delay in informing ASUSTeK of potential claims against ASUSTeK, and because of Plaintiff's continued failure to identify any infringing devices."[119]  ASUS alleges that this delay works to its prejudice rather than merely to prejudice Adams.

> Given the passage of time from 2000 to May of 2007, and Plaintiff's delay in filing suit once it discovered the alleged infringing behavior and technology of the parties, ASUSTeK [will] likely suffer significant evidentiary prejudice due to faded memories, the inability to locate key witnesses, and the loss or inability to locate allegedly relevant records in this case.[120]

### When Did the Duty To Preserve Arise?

Adams and ASUS agree that a litigant's duty to preserve evidence arises when "he knows or should know [it] is relevant to imminent or ongoing litigation."[121]  ASUS' arguments pin this date to the first letter from Plaintiff's counsel.  However, counsel's letter is not the inviolable benchmark.  In *103 Investors I, L.P. v. Square D Co.,*[122] the plaintiff building owner sued an electrical parts manufacturer for failure to warn of proper care for a part alleged to have been the

---

[118] *Id.* at 3-4.

[119] *Id.* at xiv.

[120] *Id.* at 5-6.

[121] *Jordan F. Miller Corp. v. Mid-Continent Aircraft Service, Inc.*, No. 97-5089, 1998 WL 68879, *5 (10th Cir. Feb. 20, 1998).

[122] 470 F.3d 985 (10th Cir. 2006).

fire ignition point.  "[A]fter the fire . . . without notice to the defendant [manufacturer], plaintiff

threw away fifty to sixty feet of the busway and saved only four feet.  The portion of the busway

that was saved was not a piece that would have contained a warning [label]."[123]  The disposition

of the busway was long before suit was filed.  But "[t]he district court found that plaintiff had a

duty to preserve the evidence because it knew or should have known that litigation was

imminent. . . ."[124]

In late 1999, Toshiba paid billions of dollars in a class action settlement related to the

floppy disk errors at issue[125] and a class action lawsuit was filed against HP.[126]  In early 2000,

Sam Yang was writing emails about his work on the software ASUS was using "to verify the

FDC write-data distortion."[127]  In late 2001, a patent application was filed by Yang and

ASUS.[128]  In April 2000 a class action lawsuit was filed against Sony based on this alleged

defect.[129]  Throughout this entire time, computer and component manufacturers were sensitized

to the issue.  The time period was the technology equivalent of the *103 Investors'* building fire.

The building owner may not have known that a defective wiring bus caused the fire, or that suit

would be filed, but the owner had a duty to preserve immediately after the fire.  In the 1999-2000

environment, ASUS should have been preserving evidence related to floppy disk controller

errors.

---

[123] *Id.* at 988.

[124] *Id.* at 989.

[125] Memorandum in Support at iv.

[126] Reply Memorandum at 6-7.

[127] Email January 27, 2000 9:18 am, Sam Yang to Max Lu, attached as Exhibit 1 to Adams' Supplementation.

[128] Exhibit G to Memorandum in Support.

[129] Reply Memorandum at 7.

Separate and apart from the benchmark date to *start* preservation is the last date on which information related to the patent application, including the source code, should have been available. Adams says "ASUS would have to have kept the source code for the test programs because its application remained pending until June 2005."[130] ASUS does not explain how, why or when its source code was discarded.

### Safe Harbor

ASUS claims it can find a safe harbor against sanctions because of the recently adopted rule that sanctions may not be generally imposed for "failing to provide electronically stored information lost" if a party can show the loss was "a result of the routine, good-faith operation of an electronic information system."[131] First of all, this provision only applies to electronic evidence. ASUS' arguments and factual summaries are very short on any discussion of paper documents. Other than the patent application and the executable file, it does not appear ASUS has produced any significant tangible discovery on the topics where information is conspicuously lacking.

As to the electronic discovery, including email, ASUS provided an extensive declaration from an experienced consultant in e-discovery.[132] While he stated the reasons for and history of ASUS' "distributed information architecture," he did not state any opinion as to the reasonableness or good-faith in the system's operation.[133] And while he says "ASUSTeK's data

---

[130] *Id.* at 4.

[131] Fed. R. Civ. P. 37(e).

[132] Declaration of Allen L. Gurney in Support of Third Party Defendants ASUSTeK Computer, Inc., and ASUS Computer International's Statement of Compliance with Court Order (Declaration of Allen Gurney), docket no. 461, filed February 21, 2008.

[133] *Id.* at 13-14.

architecture relies predominantly on storage on individual user's workstations,"[134] his 31-page declaration does not show he is familiar with the precise practices pointed out in the declarations of employees.  Those employees' declarations describe the practice of ASUS' email system to overwrite old data regardless of its significance; ASUS' reliance on employees for all email and data archiving; and the process of replacement of computers, which also relies on employees to transfer data from their old to their new computers.[135]  Neither the expert nor ASUS speak of archiving "policies;" they speak of archiving "practices."[136]  Apart from archiving, neither the expert nor the employees describe any sort of backup system or data backup policy, past or present.  Presumably ASUS' current data is at the mercy of individual employees' backup practices.

The expert does not evaluate risk of data loss from ASUS' reliance on employees though he does specifically mention the expected turnover of employees in this industry[137] which would seem to heighten the risk.  He does mention that certain financial-related data is stored in centrally accessible and presumably secure, backed-up servers.[138]  ASUS does know how to protect data it regards as important.

The information before the court does not demonstrate that ASUS' loss of electronic information is within the safe harbor provision.  Further, there has been no explanation of the loss of other information.

---

[134] *Id.* at 13.

[135] Memorandum in Opposition at xxvi – xxvii.

[136] *Id.* at xxxi; Declaration of Allen Gurney at 6.

[137] Declaration of Allen Gurney at 14.

[138] *Id.*

## What Sanction is Appropriate?

"When deciding whether to sanction a party for the spoliation of evidence, courts have considered a variety of factors, two of which generally carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence, and (2) the degree of actual prejudice to the other party."[139]  The most widely known sanction is the adverse inference instruction, but other sanctions range from admonitions to granting judgment or dismissal.

## Culpability

In the Tenth Circuit, "the general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction."[140]  However, "[c]ourts have not generally imposed a similar requirement of bad faith when considering other sanctions for the spoliation of evidence . . . ."[141]  The culpability of a party is a signficant factor, but not determinative.  Culpability may not mean evil intent, but may simply signify responsibility and control.

A sliding scale of sanctions may be imposed depending on the degree of control the alleged spoliator had over the evidence and the spoliator's subjective intentions.  Case law defines the factors to consider when terminating sanctions are sought.

> The district court should consider the following factors when considering whether dismissal is an appropriate sanction: (1) the degree of actual prejudice to the opposing party, (2) the degree of interference with the judicial process, (3) the litigant's culpability, (4) whether the litigant was warned in advance that dismissal was a likely sanction, and (5) whether a lesser sanction would be effective.[142]

---

[139] *Jordan Miller,* 1998 WL 68879, at *4.

[140] *Aramburu v. Boeing Co.,*  112 F.3d 1398, 1407 (10th Cir. 1997).

[141] *Jordan Miller,* 1998 WL 68879, at *4.

[142] *LaFleur v. Teen Help,* 342 F.3d 1145, 1151 (10th Cir. 2003).

In this case, ASUS has not been warned of the possibility of a terminating sanction, and has not been subject to prior orders regarding discovery conduct.  Because Adams does have some other sources for evidence, it is likely that a terminating sanction will not be appropriate.

The culpability in this case appears at this time to be founded in ASUS' questionable information management practices.  A court – and more importantly, a litigant – is not required to simply accept whatever information management practices a party may have.  A practice may be unreasonable, given responsibilities to third parties.  While a party may design its information management practices to suit its business purposes, one of those business purposes must be accountability to third parties.

For example, a recreation park's policy to destroy records at the end of each season – prior to the running of the applicable statute of limitations for injuries – has been held to entitle the plaintiff to an adverse inference instruction.[143]  In another case where an indexing system made documents practically inaccessible, the court spoke of a party's duty to use an adequate information management system:

> [U]tilizing a system of record-keeping which conceals rather than discloses relevant records, or makes it unduly difficult to identify or locate them, [renders] the production of the documents an excessively burdensome and costly expedition.  To allow a defendant whose business generates massive records to frustrate discovery by creating an inadequate filing system, and then claiming undue burden, would defeat the purposes of the discovery rules. [144]

Similarly, here, ASUS' system architecture of questionable reliability which has evolved rather than been planned, operates to deny Adams access to evidence.  This should not be excused.

---

[143] *Reingold v. Wet 'N Wild Nevada Inc.*, 944 P.2d 800 (Nev. 1997), overruled on other grounds by *Bass-Davis v. Davis,* 134 P.3d 103 (Nev. 2006).

[144] *Kozlowski v. Sears, Roebuck,* 73 F.R.D. 73 (D. Mass. 1976).

ASUS did not have a designed information management policy taking varying needs into account.  ASUS offers no statements from management-level persons explaining its practices, or existence of any policies.

"An organization should have reasonable policies and procedures for managing its information and records."[145]  "The absence of a coherent document retention policy" is a pertinent factor to consider when evaluating sanctions.[146]  Information management policies are not a dark or novel art.  Numerous authoritative organizations have long promulgated policy guidelines for document retention and destruction.

> Organizations issuing guidance in this area include ANSI (American National Standards Institute), AIIM (Association for Information and Image Management), ARMA International (Association of Records Managers and Administrators) and ISO (International Organization for Standardization).
> In 2001, ISO sought an international consensus standard for records management, including electronic records, in its guidance document ISO Technical Report 15489-2 (*Information and Documentation—Records Management* (2001)) and its accompanying standard, ISO 15489-1.16.[147]

ASUS' practices invite the abuse of rights of others, because the practices tend toward loss of data.  The practices place operations-level employees in the position of deciding what information is relevant to the enterprise and its data retention needs.  ASUS alone bears responsibility for the absence of evidence it would be expected to possess.  While Adams has not shown ASUS mounted a destructive effort aimed at evidence affecting Adams or at evidence of ASUS' wrongful use of intellectual property, it is clear that ASUS' lack of a retention policy and irresponsible data retention practices are responsible for the loss of significant data.

---

[145] Guideline 1, The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age (November 2007).

[146] Telectron, Inc. v. Overhead Door Corp.  116 F.R.D. 107, 123 (S.D. Fla. 1987)

[147] The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age (November 2007).

**Prejudice**

Prejudice might be considerable.  The evidentiary barriers ASUS asserts to the use of documents produced by third parties, and the apparent unavailability of Yang, the only person ASUS says worked on floppy disk controller error detection, combine to show that prejudice is substantial.

In many cases, terminating sanctions have been imposed against a party because its actions made evidence unavailable.  Cases have been dismissed against Plaintiffs who caused evidence to be unavailable when:

- a car was destroyed before suit was filed,[148]

- a space heater was discarded two years before filing suit,[149]

- a truck trailer was disposed of as wreckage two months before suit was filed after saving the allegedly defective part,[150]

- parts of a gas grill were discarded two years before litigation,[151] and

- a vehicle was sold for salvage three years before litigation.[152]

At least one jurisdiction has a rule that a product liability case alleging a defect in the specific item and not in the run of production must be dismissed if the product is unavailable for a reason attributable to the plaintiff, even if the destruction is inadvertent.[153]  When it is a defendant who has made evidence unavailable, default judgment may be entered.[154]  In these

---

[148] *Dillon v. Nissan Motor Co.,* 986 F.2d 263 (8th Cir. 1993).

[149] *Unigard Security Ins. Co. v. Lakewood Eng. & Mfg. Corp.*, 982 F.2d 363, 367 (9th Cir. 1992)(citing two other cases imposing sanctions for pre-filing destruction of evidence).

[150] *Stubli v. Big D Int'l Trucks, Inc.*, 810 P.2d 785 (Nev. 1991).

[151] *Allstate Ins. Co. v. Sunbeam Corp.*, 53 F.3d 804 (7th Cir. 1995).

[152] *Silvestri v. General Motors Corp.*, 271 F.3d 583 (4th Cir. 2001).

[153] *Lee v. Boyle-Midway Household Prods, Inc.*, 792 F. Supp. 1001, 1005-06 (W.D. Pa. 1992) *(citing Roselli v. General Elec. Co.*, 410 Pa.Super. 223 (Pa.Super. 1991))*.

[154] *Computer Associates Intern., Inc. v. American Fundware, Inc.*, 133 F.R.D. 166, 171 (D.Colo. 1990)*.

cases the prejudice was so severe as to deny justice in court.  Spoliation remedies are intended to compensate for the partial or total loss of the ability to litigate.

Prejudice by loss of evidence must be measured in light of "other evidence available."[155] These motions were briefed months ago.  Even now, fact discovery related to Adams' claims is still open.  It is scheduled to close May 15, 2009.[156]  Therefore the degree of prejudice and the appropriate sanction cannot be determined until the close of discovery.  Adams and ASUS will be directed to provide further briefing to enable determination of prejudice and the appropriate sanction.

## ORDER

IT IS HEREBY ORDERED that the motion for sanctions[157] is GRANTED IN PART. The magistrate judge finds that ASUS has violated its duty to preserve information and that subject to determination of prejudice, a sanction is appropriate.  Fourteen calendar days after the close of fact discovery, ASUS shall provide the court with a summary listing and a copy of all evidence ASUS has produced to Adams of:

(1)     the ASUS test programs' source code;

(2)     ASUS FDC error test program development;

(3)     ASUS' FDC and motherboard testing activities in the 2000-2001  time period;

(4)     ASUS' communications with suppliers regarding testing of the FDC problems;

(5)     ASUS' communications with design experts relating to Adams' technology;

---

[155] *North v. Ford Motor Co.*, 505 F. Supp. 2d 1113, 1116 (D. Utah 2007).

[156] Order Granting Stipulated Motion to Amend and Amended Scheduling Order, docket no. 728, filed March 24, 2009.

[157] Adams' Motion for Terminating Sanctions Against ASUS Based upon ASUS' Spoliation of Evidence of Its Piracy, docket no. 492, filed April 17, 2008.

(6) discussions occurring internally within ASUS regarding whether to license Adams' technology.

(7) ASUS' communications with its customers about the FDC issue,

(8) ASUS' efforts to resolve the FDC issue; and

(9) ASUS' patent application process for its detector technology.

Fourteen calendar days thereafter Adams may file a response which may also identify all information Adams has received from sources other than ASUS on the above topics which Adams believes would be of evidentiary value in Adams' claims against ASUS, and Adams' specific recommendation for the form of an appropriate sanction. Seven calendar days thereafter, ASUS may reply.

IT IS FURTHER ORDERED that the motion to strike Exhibit E[158] to Adams' memorandum is GRANTED IN PART.

IT IS FURTHER ORDERED that the motion to strike Exhibits A-D and I[159] is DENIED.

March 27, 2009.


Magistrate Judge David Nuffer

---

[158] ASUSTeK's Motion to Strike Exhibit E to Plaintiff's Memorandum in Support of Its Motion for Terminating Sanctions, docket no. 559, filed June 30, 2008.

[159] ASUSTeK's Motion to Strike Exhibits A, B, C, D and I and Related Arguments in Plaintiff's Memoranda in Support of Its Motion for Terminating Sanctions against ASUSTeK, docket no. 604, filed August 21, 2008.